Jeffrey L. Hartman, Esq.
Nevada Bar No. 1607
**HARTMAN & HARTMAN**
510 W. Plumb Lane, Suite B
Reno, NV 89509
T: (775) 324-2800
F: (775) 324-1818
notices@bankruptcyreno.com

Michael S. Budwick, Esq. #938777 – Admitted *Pro Hac Vice*
Solomon B. Genet, Esq. #617911 – Admitted *Pro Hac Vice*
Gil Ben-Ezra, Esq. #118089 – Admitted *Pro Hac Vice*
**MELAND BUDWICK, P.A.**
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
T: (305) 358-6363
F: (305) 358-1221
mbudwick@melandbudwick.com
sgenet@melandbudwick.com
gbenezra@melandbudwick.com

Attorneys for Christina Lovato, Chapter 7 Trustee

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| In re | Lead Case No.: BK-19-50102-gs (Chapter 7) |
| DOUBLE JUMP, INC. | |
| Debtor. | Substantively consolidated with: |

| | |
|---|---|
| 19-50130-gs | DC Solar Solutions, Inc. |
| 19-50131-gs | DC Solar Distribution, Inc. |
| 19-50135-gs | DC Solar Freedom, Inc. |

Affects:
☒ DC Solar Solutions, Inc.
☒ DC Solar Distribution, Inc.
☒ DC Solar Freedom, Inc.
☒ Double Jump, Inc.

CHRISTINA W. LOVATO, Trustee,

        Plaintiff,                                          Adversary No.:

v.

AHERN RENTALS, INC. and XTREME                **ADVERSARY COMPLAINT**
MANUFACTURING, LLC,

        Defendants.

Christina W. Lovato, in her capacity as the chapter 7 trustee ("***Trustee***" or "***Plaintiff***") for the bankruptcy estates of DC Solar Solutions, Inc. ("***Solutions***"), DC Solar Distribution, Inc. ("***Distribution***"), DC Solar Freedom, Inc. ("***Freedom***", and with Solutions and Distribution, "***DC Solar***") and Double Jump, Inc. ("***DJ***," and with DC Solar, the "***Debtors***"), files her complaint

1

("**Complaint**") commencing this adversary proceeding ("**Action**") against Ahern Rentals, Inc. ("**Ahern Rentals**") and Xtreme Manufacturing, LLC ("**Xtreme**," and with Ahern Rentals, the "**Defendants**"). The Trustee alleges as follows:

## INTRODUCTION

The Trustee brings this adversary proceeding ("**Action**") on behalf of the Debtors' estate to avoid and recover transfers made to the Defendants, to disallow Defendants' proofs of claim filed in these Bankruptcy Cases, and for other relief.

## PARTIES

1.      The Trustee is the chapter 7 bankruptcy trustee for the Debtors. The Trustee has the capacity to commence this action by way of, among other things, 11 U.S.C. § 323.

2.      Ahern Rentals is a corporation organized under the laws of the State of Nevada with its principal place of business in Las Vegas. Upon information and belief (according to Dun & Bradstreet), the company has more than 1,500 employees and $500 million in annual revenue.

3.      Xtreme is a limited liability company organized under the laws of the State of Nevada with its principal place of business in Las Vegas. Upon information and belief (according to Dun & Bradstreet), the company has more than 130 employees and $120 million in annual revenue.

## JURISDICTION

4.      The Bankruptcy Court has jurisdiction over this case and this adversary proceeding under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (C), (F), (H) and (O). Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

5.      The Trustee consents to the entry of final orders and judgments by the Bankruptcy Court.

## FACTUAL ALLEGATIONS

**I.      DC Solar and the Carpoff Ponzi Scheme**

6.      DC Solar was incorporated and headquartered in California.

7.      DC Solar had, at all material times, certain legitimate business operations.

2

8.      From no later than on or around calendar year(s) 2010 through 2018, DC Solar was engaged in a business related to manufacturing, marketing, selling, and leasing mobile solar generators ("***MSGs***").

9.      Generally, the business purported to operate as follows. Solutions would manufacture and sell MSGs for $150,000 each. The buyers were typically tax-equity funds, 95% owned by a financial investor seeking investment federal tax credits. The buyers would provide DCSS a $45,000 down-payment (30% of the total purchase price) and execute a promissory note for the remaining balance. The buyers would lease the MSGs to Solutions' affiliate Distribution, which in turn purported to sub-lease the MSG to an end-user/sub-lessee. The end-user's/sub-lessee's lease payments were intended to cover the interest payments on the promissory note.

10.     Freedom's role was in connection with marketing, branding and advertising the MSGs and DC Solar, in connection with the socially-conscious nature of solar energy.

11.     DC Solar had significant professional, operational and other expenses.

12.     The financial investor that acquired the majority stake in the buyer sought to take advantage of valuable federal income tax benefits related to the purchase, use and depreciation of the MSGs.

13.     Over the years, Solutions closed over two dozen transactions, purportedly selling over 15,000 MSGs and generating hundreds of millions of dollars of revenue.

14.     However, certain DC Solar insiders, including Jeff Carpoff, were also perpetrating a Ponzi scheme ("***Carpoff Ponzi Scheme***") through DC Solar and other entities.

15.     Carpoff caused DC Solar to transfer monies obtained from new buyers of MSGs to cover obligations owed by earlier buyers. This was contrary to Carpoff's representations (directly or indirectly) to the financial investors that sub-lessee revenue would pay those obligations. And while Carpoff (directly and indirectly) communicated to the financial investors that DC Solar had manufactured over 15,000 MSGs, the actual figure was far less. Moreover, although Carpoff (directly or indirectly) represented to the financial investors that DC Solar had a series of sub-lessees willing to pay to utilize the MSGs, some sub-leases were real but others were not.

16.     Further, Carpoff looted DC Solar to, among other things, fund his lavish lifestyle, including through casino gambling and the use of private jets and the purchase of real and personal property (such as automobiles). And Carpoff looted DC Solar to, among other things, pay-off co-conspirators and make payments such as marketing payments (legitimate or illegitimate) to third-parties. This all was intended, in material part, to further the Carpoff Ponzi Scheme and/or create the perception that DC Solar was profitable.

17.     Because of (among other things) the harm that Carpoff inflicted upon DC Solar through his wrongdoing, including the liabilities Carpoff created for DC Solar, including the Carpoff Ponzi Scheme, DC Solar was insolvent on the dates of the Total Transfers (defined below).

18.     Aside from Carpoff, some of DC Solar's other insiders knew of and participated in the Carpoff Ponzi Scheme. However, certain other DC Solar-insiders, including certain individuals who owned equity interests, and certain individuals who served as officers, and certain individuals who were executives, and certain individuals that held (or also held) management-level positions at different times and each with varying levels of authority, over one or more of the Debtors, did not know of the Carpoff Ponzi Scheme.

**II.     The Raid Through the Debtors' Bankruptcy Filing**

19.     On December 18, 2018, Federal law enforcement raided the business locations of Solutions, Distribution, and certain other affiliates ("***Raid***").

20.     After December 18, 2018 and before the Petition Date (defined below), DC Solar made substantial corporate governance changes, and retained GlassRatner Advisory & Capital Group LLC and designated Seth R. Freeman as chief restructuring officer.

21.     On February 3, 2019 ("***Petition Date***"), Solutions filed its voluntary chapter 11 petition in the Bankruptcy Court, and around the same time, the other Debtors filed voluntary chapter 11 petitions as well. The Debtors' chapter 11 bankruptcy cases were converted to chapter 7 on March 22, 2019, and the Trustee was appointed as the chapter 7 trustee.

**III.     Ahern Rentals and Xtreme Were Closely Affiliated**

22.     At all relevant times, Ahern Rentals and Xtreme were closely affiliated.

23.     Don Ahern was the ultimate majority owner and had material control over a group of entities he coined the "Ahern Family of Companies." Ahern Rentals and Xtreme are in the "family." Ahern Rentals was considered the "mother."

24.     Ahern Rentals is an equipment rental operation. Xtreme is an equipment manufacturing operation. Ahern Rentals and Xtreme shared governance, business planning, office space, employees, customers, and marketing, among other things.

25.     Don Ahern intended for the entities' corporate culture to be as a closely-owned business in which he was intimately involved. Indeed, Don Ahern's father started in the equipment business, then Don Ahern took over and grew the business, and Don Ahern's son, Evan Ahern, was potentially next-in-line.

26.     In October 2015, Don Ahern announced his creation of a "global senior executive management team" ("*Senior Team*") to oversee the Ahern Family of Companies. Don Ahern and Evan Ahern would lead the Senior Team and "develop and implement strategies to steer the Ahern family of companies."

27.     Don Ahern also created a "steering committee" for the Ahern Family of Companies, comprised of leaders from the entities, including Ahern Rentals and Xtreme. The steering committee met approximately twice-per-month to discuss matters that impacted and affected the entities. The steering committee was in place by no later than 2019, and upon information and belief was created earlier.

28.     Evan Ahern was a long-time fixture at Ahern Rentals and Xtreme – he grew up in the business.

29.     Evan Ahern began working for his father in 1990, eventually holding senior positions at Ahern Rentals including as a Board member (2004 – at least August 2017), Executive Vice President (2004 – 2014), and President (2014 – at least August 2017). From August 2017 through December 2018, Evan Ahern remained in an executive-type capacity earning approximately $800,000 per year, although his role was meaningfully altered.

30.     Evan Ahern also was part of Xtreme's corporate governance. Evan Ahern provided services on Xtreme's behalf, including related to computer technology, sales, business development, and executing certain contracts.

31.     In addition to Don Ahern and Evan Ahern, other persons simultaneously held senior executive roles or authority at both Ahern Rentals and Xtreme, such as Kirk Hartle (finance), Sami Bakdash (legal), and Michael McGhee (IT).

**IV.     Ahern Rentals and Xtreme Connects with DC Solar and Sees Opportunity**

32.     In 2013, Evan Ahern and Don Ahern (and Ahern Rentals and Xtreme) connected with Carpoff (and DC Solar). Evan Ahern and Don Ahern identified profit-making opportunities with Carpoff.

33.     From the start, Ahern Rentals and Xtreme (on the one hand) and DC Solar (on the other hand) contemplated a "unique" relationship, consisting of both equipment manufacturing (Xtreme) and equipment rental (Ahern Rentals).

34.     An executive of both Ahern Rentals and Xtreme described the relationship with DC Solar as a "*strategic alliance*" "*inclusive of manufacturing and distribution*."

35.     Carpoff worked with Don Ahern and Evan Ahern, and others, so that: (1) Xtreme would manufacture MSGs for DC Solar; while (2) Ahern Rentals would lease MSGs owned by DC Solar, including for sub-lease as part of Ahern Rentals' equipment fleet.

36.     This was a package deal, *i.e.,* the relationship with one was dependent on the relationship with the other.

37.     Ahern Rentals and Xtreme understood the mechanics of DC Solar's business model, including the structure of the tax advantaged transactions. Ahern Rentals and Xtreme understood that typically:

       a.   Solutions would manufacture the MSGs.

       b.   Solutions would sell the MSGs to a tax equity fund (the investor), making a down payment and the remainder through a promissory note.

       c.   The fund would lease the MSGs to Distribution. And then,

       d.   Distribution would sub-lease the MSGs to third party end-users.

38.     Ahern Rentals and Xtreme understood that Carpoff represented to investors that: (1) the end-users would pay Distribution on the sub-lease; (2) Distribution would pay the tax equity fund on the lease; (3) the tax equity fund would pay Solutions on the note.

39.     By no later than July 2014, Don Ahern and Evan Ahern – in connection with the relationship that they and Ahern Rentals and Xtreme had with DC Solar – engaged outside counsel that specialized in "federal tax matters" who had "experience with renewable energy financing and the related tax credits aspects."

**V.      The DC Solar-Ahern Rentals-Fund IX Transaction**

A. Fund IX Transaction Structure, Including Ahern Rentals' Role

40.     By in or around mid-2014, Carpoff was working on a tax equity transaction ("***Fund IX Transaction***") in furtherance of the Carpoff Ponzi Scheme with an investor ("***Fund IX Investor***"). The Fund IX Transaction differed from other DC Solar-sponsored tax equity transactions in that Distribution would not be the middle-man / master lessee. The Fund IX Investor required that the MSG-lessee be an end user unaffiliated with Carpoff or DC Solar. Therefore, the Fund IX Investor required that the fund (Solar Eclipse Fund IX ("***Fund IX***")) contract directly with the MSG-lessee without Distribution's involvement.

41.     Fund IX would not have closed a transaction with DC Solar absent this change to the typical structure.

42.     This created a challenge for Carpoff. Typically, he masked the inadequate third-party lease revenue through a circular flow of funds from investor-to-Solutions-to-Distribution-to-investor.

43.     But without Distribution serving as the MSG-lessee, Carpoff had to adapt. Carpoff needed help him to conceal the lack of lease revenue.

44.     Carpoff arranged for Ahern Rentals and another company - KMH Systems, Inc. ("***KMH***") – to provide that help.

45.     The Fund IX Transaction provided for Fund IX to buy 619 MSGs from Solutions, and then lease (1) 300 MSGs to KMH; and (2) 319 MSGs ("***319 MSGs***") to Ahern Rentals ("***Fund IX-Ahern Rentals Lease***").

46.    Ahern Rentals would then sub-lease ("***Ahern Rentals-EE Sublease***") the 319 MSGs to Efficient Energy Distribution, Inc. ("*EE*"). Patrick Moore purportedly signed the Ahern Rentals-EE Sublease on behalf of EE. Carpoff guaranteed EE's obligations under the EE Sublease.

47.    Evan Ahern, Don Ahern, Ahern Rentals, and Xtreme knew that Fund IX (1) required the sub-lessee EE to be unaffiliated with DC Solar; and (2) received and relied upon a representation that EE was unaffiliated with DC Solar.

48.    Pursuant to the Fund IX-Ahern Rentals Lease, Ahern Rentals would pay Fund IX $900 per month per MSG. Pursuant to the Ahern Rentals-EE Sublease, EE would pay Ahern Rentals $1,150 per month per MSG. This $250 monthly spread for each of the 319 units enabled Ahern Rentals to "earn" $957,000 in gross profit per year.

49.    Ahern Rentals performed no meaningful substantive work for this profit and benefitted greatly financially from the transaction, which was atypical and unusual for Ahern.

50.    Due to the unusual nature of the transaction, Ahern Rentals created a "dedicated location" in its computers, separate-and-apart from other matters, to track the 319 MSGs. Ahern Rentals also created a stand-alone P&L (profit-and-loss statement), separate-and-apart from its otherwise financial monitoring, to track this transaction.

### B.  Don Ahern and Evan Ahern Knew Carpoff Lied to Fund IX and Claimed DC Solar and EE Were Unaffiliated

51.    Don Ahern and Evan Ahern knew that the Fund IX Investor required EE to be unaffiliated with DC Solar and that Fund IX would not have consummated the Fund IX Transaction had it known the truth that Carpoff controlled EE.

52.    And yet Don Ahern and Evan Ahern knew that EE in fact *was* affiliated with DC Solar and that therefore Carpoff was deceiving Fund IX and the Fund IX Investor. For instance:

53.    Ahern's corporate representative testified as follows at the Trustee's November 30, 2021 R. 2004 examination of Ahern Rentals ("***Ahern Rentals R. 2004 Examination***"):

Q.    Who was Efficient Energy Distribution?
A.    My understanding is it's DC Solar.
Q.    So why not just lease [MSGs] to DC Solar? Why have a separate entity called Efficient Energy Distribution, Inc.?
A.    I don't know the answer to that. I mean, that's -- that seems like a business

8

decision on Jeff [Carpoff]'s side or DC Solar's side.

*** 

Q.    Ahern Rentals considered Efficient Energy Distribution to be an affiliate of
      DC Solar Solutions, Inc., right?

A.    Correct.

54.    When Don Ahern, Evan Ahern, or Ahern Rentals wanted to communicate with EE, they communicated with Carpoff. Evan Ahern, Don Ahern, and Ahern Rentals, considered Carpoff to be EE's "face person."

55.    Although Ahern Rentals' ability to pay its lease payments to Fund IX was dependent on Ahern receiving the sub-lease payments from EE, neither Evan Ahern, Don Ahern, nor Ahern Rentals performed any meaningful due diligence on EE. Ahern's corporate representative testified as follows at the Ahern Rentals R. 2004 Examination:

Q.    How did Ahern [Rentals] know that Efficient Energy had the financial
      capacity to pay $1,150 per month for each of these 319 units for 10 years?

A.    I don't know the answer to that.

Q.    Can you tell me any due diligence Ahern Rentals did on the financial
      capacity of Efficient Energy Distribution to make those payments?

A.    No.

Q.    For instance, tax returns, income statement, a balance sheet, a P&L, bank
      statements, anything at all that Ahern asked to look at for Efficient Energy
      to confirm that Efficient Energy had the ability to make these sort of
      payments?

A.    No.

Q.    How did Ahern Rentals know that Efficient Energy could make the
      payments?

A.    I don't know the answer.

56.    In February 2015 Ahern Rentals created an email address for Carpoff to access in his role as EE's representative: efficient_energy@ahern.com. Ahern Rentals understood that emails to this address would be delivered to Carpoff.

57.    Ahern Rentals delivered the invoices for which EE was the obligor to Carpoff. When payments were late, Ahern Rentals contacted Carpoff. Ahern Rentals never had direct contact with Mr. Moore.

58.    In July 2015 when Ahern Rentals had failed to receive three monthly lease payments totaling over $1 million from EE due and owing under the Ahern Rentals-EE Sublease,

Ahern Rentals (through Evan Ahern) formally defaulted Carpoff as the guarantor. But Ahern Rentals never declared a default or demanded payment from its primary obligor: EE.

59.    Evan Ahern, Don Ahern, and Ahern Rentals knew that DC Solar made EE's lease payments directly to Ahern Rentals.

60.    On March 13, 2015, EE filed formal dissolution papers with the California Secretary of State stating EE held no assets. Don Ahern, Evan Ahern, and Ahern Rentals knew or should have known this. Yet, Don Ahern, Evan Ahern, and Ahern Rentals did nothing about its primary obligor's dissolution.

61.    In 2016, DC Solar requested that Ahern Rentals change the title of the EE account with Ahern Rentals to DC Solar.

C.    The Fund IX Transaction was Part of the Carpoff Ponzi Scheme

62.    The Fund IX Transaction, including Don Ahern, Evan Ahern, and Ahern Rentals' willing supporting role, was all part of and in furtherance of the Carpoff Ponzi Scheme.

63.    Because of Don Ahern, Evan Ahern, and Ahern Rentals' willingness to help to deceive Fund IX, Carpoff was able to expand and grow the Carpoff Ponzi Scheme as follows:

      a.    DC Solar sold the 319 MSGs to Fund IX in exchange for a down payment and a note.

      b.    Fund IX leased the 319 MSGs to Ahern Rentals; and then

      c.    Ahern Rentals leased the 319 MSGs to EE, which was affiliated with DC Solar and the payments were funded by DC Solar.

64.    Carpoff (on the one hand) and Don Ahern, Evan Ahern, and Ahern Rentals (on the other hand) worked together to facilitate circular payments of monies, beginning-and-ending with DC Solar, with no meaningful underlying legitimate business (use of the 319 MSGs) funding the payments. EE was not a true end user of the MSGs.

VI.    **The Back-Dated and Bogus DC Solar-Ahern Rentals Lease**

65.    On April 20, 2015, Carpoff sent an email ("***April 20, 2015 Email***") to Evan Ahern attaching three documents:

a. A lease dated June 1, 2014 between Distribution and Ahern Rentals, whereby Ahern Rentals would lease 1,000 units *from Distribution* for $900 per month per MSG, executed by Paulette Carpoff (Jeff Carpoff's wife) on behalf of Distribution.

b. A sub-lease dated June 1, 2014 between Ahern Rentals and Solutions, whereby Ahern Rentals *would sub-lease back to Solutions those same 1,000* units*, for the same $900 per month per MSG, executed by Carpoff on behalf of Solutions.

c. A personal guaranty signed by Carpoff.

66.    In his April 20, 2015 Email, Carpoff stated that they had been working on these three documents for "over a year." Carpoff signed (or caused to be signed) each of these documents as if they were executed on June 1, 2014.

67.    But Evan Ahern knew that these documents were <u>not</u> signed on June 1, 2014 and were in truth signed many months later and backdated to provide a false representation.

68.    Evan Ahern knew that the transaction encapsulated in this email (the lease *to Ahern Rentals* and then the lease back *from Ahern Rentals*, of the same 1,000 units, for the same monthly lease-price) made zero financial or business sense.

69.    Nonetheless, Evan Ahern, as President of Ahern Rentals, executed the June 1, 2014 lease of 1,000 units (from Distribution to Ahern Rentals), back-dated to June 1, 2014 ("***June 1, 2014 Prime Lease***").

70.    Carpoff used the June 1, 2014 Prime Lease in furtherance of the Carpoff Ponzi Scheme, including to induce investors to invest in transactions.

**VII.    <u>Xtreme</u>**

A.    <u>Xtreme and Ahern Rentals Were Unified With Regard to DC Solar</u>

71.    In part because of the overlapping ownership, corporate governance, and operations between Ahern Rentals and Xtreme, their decision to do business with DC Solar was a joint one. Ahern Rentals' business relationship with DC Solar was dependent on Xtreme's business relationship with DC Solar.

72.    On November 11, 2014, Evan Ahern – Ahern Rentals' then-President and Board member – signed a manufacturing agreement ("***Manufacturing Agreement***") on behalf of Xtreme

memorializing the business relationship between Xtreme and DC Solar. Don Ahern also approved the agreement and Evan Ahern's execution of it on Xtreme's behalf.

73.    Xtreme manufactured MSGs for DC Solar knowing (through at least Don Ahern and Evan Ahern) that Carpoff was deceiving investors and third parties, such as Fund IX, about DC Solar's operations and leasing of units.

   B.  Carpoff Required a Compliant Manufacturing Partner to Further the Carpoff Ponzi Scheme, and Found that Partner in Xtreme

74.    Carpoff required a manufacturing partner to further the Carpoff Ponzi Scheme.

75.    Carpoff desired to manufacture MSGs with Xtreme for a number of reasons. This would maintain legitimate business at DC Solar. But it would also further the Carpoff Ponzi Scheme by: (1) giving the appearance of a successful and legitimate operation; (2) rewarding Don Ahern and Evan Ahern financially for assisting Carpoff's wrongdoing; and (3) inducing investors to continue to invest with DC Solar, which was the cash-engine for the Ponzi Scheme.

76.    Carpoff represented to investors and potential investors that: (1) Xtreme was a manufacturer of MSGs; and (2) Ahern Rentals was an end-user of MSGs. This furthered the solicitation of new investors. Indeed, certain potential and actual investors had direct and indirect communications with Xtreme, sometimes through Evan Ahern, regarding Xtreme's and Ahern Rentals' relationship with DC Solar.

77.    Xtreme was a willing participant in Carpoff's wrongdoing, including by (1) manufacturing MSGs knowing that Carpoff was making misrepresentations to investors and engaged in other wrongdoing; (2) providing information about itself to be included in DC Solar marketing materials which it knew would be used to induce new investors to invest with DC Solar; and (3) serving as a reference to investors and potential investors while concealing wrongdoing from them.

VIII.   **Evan Ahern, Don Ahern, Ahern Rentals, and Xtreme Had a Close and Deviant Relationship with Carpoff**

78.    Evan Ahern, Don Ahern, Ahern Rentals, and Xtreme had a close and deviant relationship with Carpoff. For instance:

A.  Personal Relationship

79.     Evan Ahern and/or Don Ahern (on the one hand) and Carpoff (on the other hand) had a personal relationship. For example, they had family dinner and a barbeque. They discussed personal matters.

80.     Carpoff recognized that Don Ahern and Evan Ahern were highly motivated to make money, and that they were willing to commit bad acts. Carpoff learned that Don Ahern had strong disdain for his son and was mean and abusive towards him, which contributed to Evan Ahern experiencing financial pressures. Ultimately, in 2020, Evan Ahern filed a bankruptcy petition in this District.

B.  Shared Office Space

81.     Evan Ahern, through a company he owned and controlled, leased office space from DC Solar at a DC Solar-business location.

82.     As a result, from at least 2016 – 2018, Evan Ahern maintained an office at a DC Solar business location – the same location as Carpoff's office.

C.  Fund IX

83.     Evan Ahern and Don Ahern were willing to deceive the Fund IX Investor.

D.  Ahern Ad

84.     Evan Ahern, through Ahern Ad, LLC ("***Ahern Ad***"), did business with Carpoff. They worked on an electric vehicle charging business and an advertising business, all related to DC Solar MSGs.

85.     Evan Ahern received better than arms-length terms on these business dealings.

86.     Evan Ahern through Ahern Ad signed certain false documents reflecting that Ahern Ad was leasing MSGs from DC Solar, when in fact it was not.

E.  Evan Ahern's Inducement of New Victims into the Carpoff Ponzi Scheme

87.     At Carpoff's request and on behalf of Ahern Rentals and Xtreme, Evan Ahern (and others at Ahern Rentals and Xtreme) provided a "reference" for Carpoff and DC Solar. Carpoff asked Evan Ahern to speak with potential investors to vouch for Carpoff in furtherance of the Carpoff Ponzi Scheme.

88.     Evan Ahern faithfully served as a reference, evincing the close relationship. He also omitted facts from the potential investors making his representations to them false or misleading. For instance:

89.     <u>First</u>, in April 2017, a potential investor considering a transaction with DC Solar requested to speak with Ahern Rentals as part of its due diligence. DC Solar connected the potential investor with Evan Ahern and a conference call was arranged. After that call, the potential investor reported back to DC Solar in part as follows:

> Evan [Ahern] was a **wealth of information** as well as very generous with his time. I'm not sure I understood before **how heavily his company was involved in the manufacture of the equipment.** Perhaps because of this, he was much more knowledgeable than I was expecting.

(emphasis added).

"[Evan Ahern's] company" that was "heavily … involved in the manufacture of the equipment" and that allowed him to be so "knowledgeable," was Xtreme.

90.     Evan Ahern concealed and failed to disclose to this potential investor Ahern Rentals' deceptive and fraudulent role in the Fund IX Transaction.

91.     <u>Second</u>, in May 2017, to assist Carpoff's securing another investor, Evan Ahern and Michael McGhee provided Carpoff with information about DC Solar's relationship with Ahern Rentals and Xtreme. Evan Ahern and Michael McGhee included information regarding both the Fund IX Transaction and the June 1, 2014 Prime Lease.

92.     As part of this information, Evan Ahern and Michael McGhee referenced "the next [DC Solar] transaction being contemplated" and that "the extent of DC Solar's relationship with Ahern [goes] beyond being a sublessor of units" to include "manufacturing affiliate Xtreme", which "continues to work with [DC Solar] both on production and R&D projects." Evan Ahern's and Michael McGhee's goal was to vouch for and support Carpoff.

93.     Again, Evan Ahern and Michael McGhee concealed and did not disclose to this potential investor the wrongdoing in connection with the Fund IX Transaction.

94. <u>Third</u>, in June 2018, at DC Solar's request, Evan Ahern spoke with a potential investor and they "discussed the fact that … Ahern Rentals was leasing DC Solar units and renting them to customers and Xtreme Manufacturing was manufacturing units as well."

95. Again, Evan Ahern concealed and did not disclose to this potential investor the wrongdoing in connection with the Fund IX Transaction.

96. Evan Ahern concealed and did not disclose to this potential investor that in August 2017 his employment relationship with Ahern Rentals changed. Evan Ahern concealed this information to maximize the value and effectiveness of his vouching for Carpoff.

F. <u>Sharing Confidential Information</u>

97. Evan Ahern shared confidential and attorney-client privileged information with Carpoff. In doing so, Evan Ahern waived the attorney-client privilege held between Ahern Rentals and its legal counsel.

98. For example, on August 22, 2014, attorneys representing Ahern Rentals and Xtreme emailed Evan Ahern regarding the Fund IX Transaction, including business and legal points. The bottom of the email states:

> This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.

99. Within hours of receipt, Evan Ahern forwarded this August 22, 2014 email to Carpoff, cautioning him:

> Fyi … Confidential, keep this to yourself. …

100. Evan Ahern believed his relationship with Carpoff was so intimate that he could share internal, confidential information and Carpoff could be trusted to maintain that information in confidence.

G. <u>Select Other Items</u>

101. On September 8, 2014, Carpoff and his wife contributed $10,000 to a candidate's campaign for Lieutenant Governor of Nevada that was solicited by Don Ahern or Evan Ahern. Ahern family members also contributed significant sums to this campaign.

102. At least one individual worked for both DC Solar and Ahern Rentals.

15

103.    In August 2016, Carpoff offered Evan Ahern free use of Carpoff's condominium in Cabo, Mexico.

**IX.    Evan Ahern Signed Certain False and Fabricated Acceptance Certificates**

104.    Carpoff used acceptance certificates ("***Acceptance Certificates***") as part of DC Solar's business and his fraudulent scheme to demonstrate to investors that a particular lessee had accepted (received, tested, and inspected) specific batches of MSGs.

105.    Evan Ahern considered the Acceptance Certificates to be "very important" because they verified that MSGs were delivered, tested, and received.

106.    Among other times, in 2017, Carpoff induced investors to invest hundreds of millions of dollars as part of the Carpoff Ponzi Scheme in reliance on Acceptance Certificates which identified "Evan Ahern" as the signatory. In doing so Evan Ahern attested to the fact that Ahern Rentals had accepted hundreds of MSGs.

107.    Evan Ahern has denied under oath signing certain of these Acceptance Certificates, claiming his signature was forged. On another occasion he claimed he quickly, mistakenly, and innocently signed the "very important" Acceptance Certificate because he failed to read it.

108.    Upon information and belief, Evan Ahern gave false testimony under oath at his Rule 2004 examination and in fact did sign these Acceptance Certificates.

109.    Upon information and belief, Evan Ahern knowingly signed and delivered to Carpoff, for delivery to his investors, these Acceptance Certificates that purported to show that Ahern Rentals (and / or Ahern Ad) took delivery of many hundreds of MSGs from DC Solar under long-term leases. Evan Ahern did so to assist Carpoff in deceiving investors.

110.    Upon information and belief, Carpoff paid Evan Ahern in cash as his compensation (bribes) for improperly signing the false Acceptance Certificates. Upon information and belief Evan Ahern did not properly report these payments in his Tax Returns in order to conceal these payments because he knew they were wrongful, unearned, and improper. This reflects his consciousness of guilt.

## X.    Evan Ahern Signed and Back-Dated a False Acceptance Certificate

111.    In addition to the false and fabricated Acceptance Certificates discussed in Section IX above, in June 2018 Carpoff emailed Evan Ahern directing him to sign an Acceptance Certificate that had been backdated almost two-and-a-half years to February 15, 2016.

112.    Evan Ahern obliged and promptly signed and returned this Acceptance Certificate to Carpoff later that same day.

113.    Carpoff used this back-dated Acceptance Certificate in furtherance of the Carpoff Ponzi scheme and to mislead investors and potential investors.

## XI.    Other Bribes of Evan Ahern

114.    Carpoff used the entity J&C Consulting, Inc. ("**J&C**"), among other entities, to perpetrate the Carpoff Ponzi Scheme. Carpoff's sister, Carrie Boden, was formally J&C's owner and sole officer. However, she took direction from Carpoff related to J&C.

115.    For example, Carpoff directed Boden to make transfers out of J&C to further the Carpoff Ponzi Scheme by: (1) looting DC Solar for Carpoff's personal benefit; (2) paying bribes to co-conspirators in the Ponzi scheme, such as Alan Hansen, who also signed a fraudulent lease.

116.    Carpoff bribed Evan Ahern through J&C to induce Evan Ahern to assist and cause Ahern Rentals to assist in the Carpoff Ponzi Scheme and to otherwise reward Evan Ahern. For instance:

    a.  On April 27, 2017, J&C transferred $250,000 to Ahern Ad to benefit Evan Ahern.

    b.  On June 21, 2018, J&C transferred $100,000 to Ahern Ad to benefit Evan Ahern.

    c.  On November 14, 2018, J&C transferred $100,000 to Evan Ahern's entity GPSPro, LLC to benefit Evan Ahern.

117.    Neither Evan Ahern nor J&C nor Ahern Ad nor GPSPro memorialized in writing the terms of these transfers, which were bribes.

## XII.    There was Some Real Manufacturing and Real Renting of Units

118.    Xtreme Manufacturing did manufacture some MSGs for DC Solar. However,

Xtreme manufactured less MSGs than DC Solar paid for.

119.    Ahern Rentals did lease some MSGs from DC Solar, which it placed in its equipment fleet for rental to third parties. However, Ahern Rentals had trouble sub-leasing these MSGs. And many MSGs had operational problems.

120.    Nonetheless, because of their close and wrongful relationship, and the financial benefits that Ahern Rentals and Xtreme were gaining, Evan Ahern and Don Ahern maintained these MSGs in their equipment rental fleet.

**XIII.    Ahern Rentals' Termination of Evan Ahern**

121.    By no later than February 13, 2019, law enforcement publicly filed a declaration discussing the Carpoff Ponzi Scheme including Ahern Rentals' improper role in the Fund IX Transaction.

122.    On April 5, 2019, Ahern Rentals terminated Evan Ahern's employment (an employee since 1990, including EVP, President, and Board Member) "for cause."

123.    Ahern Rentals' "cause" for termination included Evan Ahern's wrongdoing in connection with DC Solar.

**XIV.    The Transfers**

124.    Within four years of the Petition Date, Carpoff caused Solutions and Distribution to make each of the transfers to Ahern Rentals as reflected in **Exhibit 1** ("***Ahern Transfers***"), totaling $17,272,547.32.

125.    Within four years of the Petition Date, Carpoff caused Solutions to make each of the transfers to Xtreme as reflected in **Exhibit 2,** totaling $15,826,270.04 ("***Xtreme Transfers***", and together with the Ahern Transfers, the "***Total Transfers***").

126.    The amount of the Total Transfers is $33,098,817.36.

**XV.    Triggering Creditor**

127.    There was and is at least one creditor of the Debtors in existence at the time of the Total Transfers who held at all material times an unsecured claim that was and is allowable under Bankruptcy Code § 502.

18

128. These creditors include at least: (1) SolarSense DCS I, LLC; (2) Solar Eclipse Investment Fund III, LLC; (3) PG&E; (4) Ally Bank; and (5) Fund IX.

## CLAIMS FOR RELIEF

### COUNT I
### Preferential Transfer - 11 U.S.C. § 547
### [Ahern Rentals]

129. The Trustee re-alleges paragraphs 1 through 128 as though fully stated herein.

130. DC Solar made certain of the Ahern Transfers within 90 days of the Petition Date ("***Ahern Rentals 90-Day Transfers***").

131. DC Solar made certain of the Ahern Transfers within 1 year of the Petition Date ("***Ahern 1-Year Transfers***," together with the Ahern 90-Day Transfers, the "***Ahern Preferential Transfers***").

132. Ahern Rentals was an insider of DC Solar as: (1) Ahern Rentals and DC Solar, through (possibly among others) their senior executives Carpoff (on the one hand) and Don Ahern and Evan Ahern (on the other hand) had a very close relationship; and (2) the transactions between Ahern Rentals and DC Solar were negotiated and implemented at less than arm's length.

133. Ahern Rentals was a creditor of DC Solar and the Ahern Preferential Transfers benefitted Ahern Rentals. The Ahern Preferential Transfers were made on account of an antecedent debt as the liability arose prior to the Petition Date.

134. DC Solar was presumptively insolvent and actually insolvent at the time of the Ahern Preferential Transfers. During the period of the Ahern Preferential Transfers, Carpoff was perpetrating the Carpoff Ponzi Scheme through DC Solar and other entities. By virtue of the Carpoff Ponzi Scheme and the claims held by the buyers of MSGs against DC Solar, among other reasons, DC Solar was insolvent as its liabilities exceeded its assets.

135. The Ahern Preferential Transfers enabled Ahern Rentals to receive more than it would have received if the case were a case under Chapter 7, the Ahern Preferential Transfers had not been made, and it received payment to the extent of the provisions of this title.

19

### COUNT II
### Actual Fraudulent Transfer
### 11 U.S.C. § 548(a)(1)(A)
### [Ahern Rentals]

136.    The Trustee re-alleges paragraphs 1 through 128 as though fully stated herein.

137.    DC Solar made certain of the Ahern Rentals Transfers within two years of the Petition Date ("*Ahern 2-Year Transfers*").

138.    Carpoff caused DC Solar to make the Ahern 2-Year Transfers with the actual intent to hinder, delay or defraud the Debtors' creditors.

### COUNT III
### Constructive Fraudulent Transfer
### 11 U.S.C. §§ 548(a)(1)(B)
### [Ahern Rentals]

139.    The Trustee re-alleges paragraphs 1 through 128 as though fully stated herein.

140.    DC Solar made the Ahern 2-Year Transfers within two years of the Petition Date.

141.    By no later than the time of the Ahern 2-Year Transfers, Carpoff was perpetrating the Carpoff Ponzi Scheme through DC Solar and other entities. At the time of the Ahern 2-Year Transfers, because of the Carpoff Ponzi Scheme and the claims of the buyers of MSGs against DC Solar, DC Solar: (1) was insolvent, as their liabilities exceeded their assets; (2) were engaged (and were continuing to engage) in a business or transaction for which DC Solar's property remaining after the Ahern 2-Year Transfers constituted unreasonably small capital; and (3) would incur debts beyond their ability to pay.

142.    DC Solar did not receive reasonably equivalent value in exchange for the Ahern 2-Year Transfers. Indeed, Carpoff caused all (or nearly all) of the Ahern 2-Year Transfers to be made by DC Solar on account of EE's obligations under the Ahern Rentals-EE Sublease, for which DC Solar was not an obligor.

### COUNT IV
### Actual Fraudulent Transfer
### 11 U.S.C. § 544 and California Civil Code §§ 3439.04(a)(1) and
### 3439.07, NRS 112.180(1)(a), or other applicable state law
### [Ahern Rentals]

143.    The Trustee re-alleges paragraphs 1 through 128 as though fully stated herein.

20

144.    DC Solar made certain of the Ahern Transfers within four years of the Petition Date ("***Ahern 4-Year Transfers***").

145.    DC Solar made the Ahern 4-Year Transfers with the actual intent to delay, hinder or defraud the Debtors' creditors.

## COUNT V
### Constructive Fraudulent Transfer
### 11 U.S.C. § 544 and California Civil Code §§ 3439.04(a)(2) or 3439.05 and 3439.07, NRS 112.180(1)(b), NRS 112.190(1) & (2), or other applicable state law
### [Ahern Rentals]

146.    The Trustee re-alleges paragraphs 1 through 128 as though fully stated herein.

147.    DC Solar made the Ahern 4-Year Transfers within four years of the Petition Date.

148.    By no later than the time of the Ahern 4-Year Transfers, Carpoff was perpetrating the Carpoff Ponzi Scheme through DC Solar and other entities. The Ahern 4-Year Transfers were made (1) without DC Solar receiving reasonably equivalent value in exchange for such transfers; and (2) at a time when DC Solar were insolvent or as a result of which DCSS and DCSD became insolvent; or (3) at a time that DC Solar was engaged in a business or a transaction, or about to engage in a business or a transaction, for which any property remaining with DC Solar was an unreasonably small capital; or (4) at a time when DC Solar would incur debts that would be beyond DC Solar's ability to pay as such debts matured.

149.    DC Solar did not receive reasonably equivalent value in exchange for the Ahern 4-Year Transfers. Indeed, Carpoff caused all (or nearly all) of the Ahern 4-Year Transfers to be made by DC Solar on account of EE's obligations under the Ahern Rentals-EE Sublease, for which DC Solar was not an obligor.

## COUNT VI
### Quasi-Contract Seeking Restitution as Remedy for Unjust Enrichment
### [Ahern Rentals]

150.    The Trustee re-alleges paragraphs 1 through 128 as though fully stated herein.

151.    As a result of the Ahern 4-Year Transfers, DC Solar conferred a benefit upon Ahern Rentals.

152.    Because, among other things, the Ahern 4-Year Transfers were made in connection with and in furtherance of the Carpoff Ponzi Scheme, and for which the Debtors received no value because the Debtors were not obligors to Ahern Rentals on these payments, Ahern Rentals wrongly and unjustly received and retained this benefit.

153.    Ahern Rentals wrongly and unjustly received and retained the benefit of the Ahern 4-Year Transfers.

154.    It would be unjust to permit Ahern Rentals to retain this benefit.

155.    Ahern Rentals knew or had reason to know of the facts constituting its unjust enrichment, as it had knowledge of and was a participant in Carpoff's wrongdoing and provided no value to DC Solar in exchange.

**COUNT VII**
**11 U.S.C. §550**
**[Ahern Rentals]**

156.    The Trustee re-alleges paragraphs 1 through 128 as though fully stated herein.

157.    Ahern Rentals is the initial transferee of the Ahern Transfers, and the entity for whose benefit the Ahern Transfers were made.

158.    Therefore, once avoided, the Trustee may recover the Ahern Transfers from Ahern Rentals.

**COUNT VIII**
**Disallowance of Claim**
**[Ahern Rentals]**

159.    The Trustee re-alleges paragraphs 1 through 128 as though fully stated herein.

160.    Ahern Rentals filed the following proofs of claim in Distribution's bankruptcy cases: Claim No. 1-1 (in the name of 7975 Orchestra Ave but the face of the claim and the attaching documents indicates it is on Ahern Rentals' behalf) and Claim No. 2-1; and the following claim in Solutions' bankruptcy case: Claim 2-1 (in the name of 7975 Orchestra Ave but the face of the claim and the attaching documents indicates it is on behalf of Ahern Rentals) (collectively, the "*Ahern POCs*").

161.    The Ahern POCs should be disallowed pursuant to 11 U.S.C. § 502(d). *See* Counts 1-5, 7 above.

162.    The Ahern POCs should be disallowed because Ahern Rentals was a wrongdoer in connection with Carpoff, including participating in the Carpoff Ponzi Scheme.

163.    The Ahern POCs should be disallowed because EE was the obligor to Ahern Rentals, and not DC Solar.

<u>COUNT IX</u>
**Preferential Transfer - 11 U.S.C. § 547**
**[Xtreme]**

164.    The Trustee re-alleges paragraphs 1 through 128 as though fully stated herein.

165.    DC Solar made certain of the Xtreme Transfers within 90 days of the Petition Date ("***Xtreme 90-Day Transfers***").

166.    DC Solar made certain of the Xtreme Transfers within 1 year of the Petition Date ("***Xtreme 1-Year Transfers***," and together with the Xtreme 90-Day Transfers, the "***Xtreme Preferential Transfers***").

167.    Xtreme was a DC Solar insider as: (1) Xtreme and DC Solar, through (possibly among others) their senior executives Carpoff (on the one hand) and Don Ahern and Evan Ahern (on the other hand), had a very close relationship; and (2) the transactions between and among Xtreme and DC Solar were negotiated and implemented at less than arm's length.

168.    Xtreme was a creditor of DC Solar and the Xtreme Preferential Transfers benefitted Xtreme. The Xtreme Preferential Transfers were made on account of an antecedent debt as the liability arose prior to the Petition Date.

169.    DC Solar was presumptively insolvent and actually insolvent at the time of the Xtreme Preferential Transfers. During the period as the Xtreme Preferential Transfers, Carpoff was perpetrating the Carpoff Ponzi Scheme through DC Solar and other entities. By virtue of the Carpoff Ponzi Scheme and the claims held by the buyers of MSGs against DC Solar, among other reasons, DC Solar was insolvent as its liabilities exceeded its assets.

170.    The Xtreme Preferential Transfers enabled Xtreme to receive more than it would have received if the case were a case under Chapter 7, the Xtreme Preferential Transfers had not been made, and it received payment to the extent of the provisions of this title.

### COUNT X
### Actual Fraudulent Transfer
### 11 U.S.C. § 548(a)(1)(A)
### [Xtreme]

171.     The Trustee re-alleges paragraphs 1 through 128 as though fully stated herein.

172.     DC Solar made certain of the Xtreme Transfers within two years of the Petition Date ("***Xtreme 2-Year Transfers***").

173.     Carpoff caused DC Solar to make the Xtreme 2-Year Transfers with the actual intent to hinder, delay or defraud the Debtors' creditors.

### COUNT XI
### Constructive Fraudulent Transfer
### 11 U.S.C. §§ 548(a)(1)(B)
### [Xtreme]

174.     The Trustee re-alleges paragraphs 1 through 128 as though fully stated herein.

175.     DC Solar made the Xtreme 1-Year Transfers within one year of the Petition Date.

176.     By no later than the time of the Xtreme 1-Year Transfers, Carpoff was perpetrating the Carpoff Ponzi Scheme through DC Solar and other entities. At the time of the Xtreme Advance Transfers, because of the Carpoff Ponzi Scheme and the claims of the buyers of MSGs against DC Solar, DC Solar: (1) were insolvent, as their liabilities exceeded their assets; (2) were engaged (and were continuing to engage) in a business or transaction for which DCSS' and DCSD's property remaining after the Xtreme Advance Transfers constituted unreasonably small capital; and (3) would incur debts beyond their ability to pay.

177.     DC Solar did not receive reasonably equivalent value in exchange for the Xtreme 1-Year Transfers. The Xtreme 1-Year Transfers were advance payments on MSGs that were never delivered to DC Solar. DC Solar otherwise did not receive what it bargained for under the Manufacturing Agreement. And DC Solar otherwise did not receive fair return value.

178.     DC Solar also did not receive fair return value for the Xtreme 1-Year Transfers because Xtreme's controlling people, including Don Ahern and Evan Ahern, were bad actors that were harming DC Solar including by participating in Carpoff's wrongdoing.

179.    Pursuant to the Manufacturing Agreement, or otherwise, DC Solar provided Xtreme with batteries, panels and other componentry parts ("*DC Solar Property*") owned by DC Solar for Xtreme to use to assemble the MSGs.

180.    Upon information and belief, at the time of the Raid, DC Solar had provided a substantial amount of DC Solar Property to Xtreme.

181.    Upon information and belief, Xtreme never provided the completed MSGs to DC Solar nor did it return the DC Solar Property to DC Solar, instead retaining it for its own benefit.

182.    DC Solar did not receive fair value in exchange for Extreme's retention of the DC Solar Property.

### COUNT XII
**Actual Fraudulent Transfer**
**11 U.S.C. § 544 and California Civil Code §§ 3439.04(a)(1) and**
**3439.07, Nevada Stat. 112.180(1)(a), or other applicable state law**
**[Xtreme]**

183.    The Trustee re-alleges paragraphs 1 through 128 as though fully stated herein.

184.    DC Solar made certain of the Xtreme Transfers within four years of the Petition Date ("*Xtreme 4-Year Transfers*").

185.    DC Solar made the Xtreme 4-Year Transfers with the actual intent to delay, hinder or defraud the Debtors' creditors.

### COUNT XIII
**Fraudulent Transfer, 11 U.S.C. §544 and NRS 112.190**
**[Xtreme]**

186.    The Trustee re-alleges paragraphs 1 through 128 as though fully stated herein.

187.    DC Solar made the Xtreme 4-Year Transfers within 4 years of the Petition Date.

188.    By no later than the time of the Xtreme 4-Year Transfers, Carpoff was perpetrating the Carpoff Ponzi Scheme through DC Solar and other entities. At the time of the Xtreme 4-Year Transfers, because of the Carpoff Ponzi Scheme and the claims of the buyers of MSGs against DC Solar, DC Solar: (1) were insolvent, as their liabilities exceeded their assets; (2) were engaged (and were continuing to engage) in a business or transaction for which DCSS' and DCSD's property

remaining after the Xtreme 4-Year Transfers constituted unreasonably small capital; and (3) would incur debts beyond their ability to pay.

189.    These payments were made on an antecedent debt, arising from the Manufacturing Agreement.

190.    Xtreme was an insider of DC Solar, through the close relationship with Don Ahern and Evan Ahern, among others.

191.    Xtreme had reason to believe the debtor was insolvent, through Don Ahern and Evan Ahern, among others.

### COUNT XIV
### 11 U.S.C. §550
### [Xtreme]

192.    The Trustee re-alleges paragraphs 1 through 128 as though fully stated herein.

193.    Xtreme is the initial transferee of the Xtreme Transfers, and the entity for whose benefit the Xtreme Transfers were made. Therefore, once avoided, the Trustee may recover the Xtreme Transfers from Xtreme.

### COUNT XV
### Disallowance of Claim
### [Xtreme]

194.    The Trustee re-alleges paragraphs 1 through 128 as though fully stated herein.

195.    Xtreme filed the following proof of claim in the Solutions bankruptcy case: Claims Nos. 29-1 ("*Xtreme POC*").

196.    The Xtreme POC should be disallowed pursuant to 11 U.S.C. § 502(d). *See* Counts 9 – 14 above.

197.    The Xtreme POC (and any other proof of claim asserted by or on behalf of Xtreme) should be disallowed because Xtreme was a wrongdoer in connection with Carpoff, including participating in Carpoff's wrongdoing.

### COUNT XVI
### Turnover – 11 U.S.C. § 542 and other applicable law
### [Xtreme]

198.    The Trustee re-alleges paragraphs 1 through 128 as though fully stated herein.

26

199.    Pursuant to the Manufacturing Agreement, or otherwise, DC Solar provided the DC Solar Property to Xtreme to use to assemble the MSGs.

200.    Upon information and belief, at the time of the Raid, DC Solar had provided a substantial amount of DC Solar Property to Xtreme.

201.    Xtreme never provided the completed MSGs to DC Solar nor did it return the DC Solar Property to DC Solar.

202.    Xtreme should be required to turn over the DC Solar Property to the Trustee.

**WHEREFORE**, the Trustee prays for and demands order and judgment against the Defendants as follows:

(1) Count I:        Avoiding the Ahern Preferential Transfers.

(2) Count II:       Avoiding the Ahern 2-Year Transfers.

(3) Count III:      Avoiding the Ahern 2-Year Transfers.

(4) Count IV:       Avoiding the Ahern 4-Year Transfers.

(5) Count V:        Avoiding the Ahern 4-Year Transfers.

(6) Count VI:       Restitution in the amount of the Ahern 4-Year Transfers.

(7) Count VII:      Entering a Judgment in the amount of the avoided transfers in favor of the Trustee and against Ahern Rentals;

(8) Count VIII:     Disallowing the Ahern POCs.

(9) Count IX:       Avoiding the Xtreme Preferential Transfers

(10)        Count X:        Avoiding the Xtreme 2-Year Transfers

(11)        Count XI:       Avoiding the Xtreme 1-Year Transfers

(12)        Count XII:      Avoiding the Xtreme 4-Year Transfers

(13)        Count XIII:     Avoiding the Xtreme 4-Year Transfers

(14)        Count XIV:      Entering a Judgment in the amount of the avoided transfers in favor of the Trustee and against Xtreme.

(15)        Count XV:       Disallowing the Xtreme POCs.

(16)        Count XVI:      Ordering that Xtreme turn over the DC Solar Property to the Trustee or otherwise pay their fair value to the Trustee.

In addition, the Trustee requests from the Court (1) interest both before and after the commencement of this action; (2) attorney's fees as allowable by law; (3) punitive damages as allowable by law; and (4) any such other and further relief, equitable or otherwise, that this Court deems just and proper.

DATED: January 14, 2022.

**HARTMAN & HARTMAN**

*/s/ Jeffrey L. Hartman, Esq.*
Jeffrey L. Hartman, Esq.
Attorneys for Plaintiff Christina W. Lovato

**MELAND BUDWICK, P.A.**

*/s/ Michael S. Budwick, Esq.*
Michael S. Budwick, Esq., Admitted Pro Hac Vice
Solomon B. Genet, Esq., Admitted Pro Hac Vice
Gil Ben-Ezra, Esq., Admitted Pro Hac Vice
Attorneys for Plaintiff Christina W. Lovato

| Clear Date | Transferor | Transferee | Cash Disbursements |
|---|---|---|---|
| 03/12/15 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | $        366,850.00 |
| 04/15/15 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 366,850.00 |
| 10/27/15 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 3,549.53 |
| 12/01/15 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 7,872.26 |
| 12/16/15 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 366,850.00 |
| 01/06/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 733,700.00 |
| 02/29/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 366,850.00 |
| 03/07/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 95.34 |
| 03/18/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 3,955.80 |
| 03/22/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 219.88 |
| 03/28/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 366,850.00 |
| 04/08/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 9,193.08 |
| 04/25/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 2,147.41 |
| 05/04/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 366,850.00 |
| 05/09/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 4,647.97 |
| 05/13/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 3,316.99 |
| 05/17/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 366,850.00 |
| 05/23/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 1,089.46 |
| 06/01/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 2,545.03 |
| 06/14/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 1,089.46 |
| 06/14/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 1,057.95 |
| 06/21/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 555.00 |
| 06/30/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 366,850.00 |
| 07/11/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 1,057.95 |
| 07/13/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 366,850.00 |
| 07/25/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 1,055.82 |
| 08/08/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 1,057.95 |
| 08/30/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 568.10 |
| 09/14/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 366,850.00 |
| 09/14/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 366,850.00 |
| 09/20/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 1,081.56 |
| 10/11/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 1,055.82 |
| 10/17/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 366,850.00 |
| 10/27/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 4,229.84 |
| 11/08/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 77.75 |
| 11/17/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 366,850.00 |
| 11/21/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 1,420.26 |
| 12/09/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 2,421.75 |
| 12/12/16 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 366,850.00 |
| 01/04/17 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 1,055.82 |
| 02/02/17 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 366,850.00 |
| 02/06/17 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 1,055.82 |
| 02/08/17 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 366,850.00 |
| 02/27/17 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 1,055.82 |

**EXHIBIT 1** Page 1 of 4

| Clear Date | Transferor | Transferee | Cash Disbursements |
|---|---|---|---|
| 03/08/17 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 366,850.00 |
| 04/04/17 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 1,055.82 |
| 04/24/17 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 1,055.82 |
| 05/05/17 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 366,850.00 |
| 05/30/17 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 1,056.70 |
| 06/07/17 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 366,850.00 |
| 06/08/17 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 366,850.00 |
| 06/13/17 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 1,056.70 |
| 07/12/17 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 366,850.00 |
| 07/18/17 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 1,056.70 |
| 08/08/17 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 366,850.00 |
| 08/22/17 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 1,056.70 |
| 09/06/17 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 1,056.70 |
| 09/07/17 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 398,950.97 |
| 10/11/17 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 2,799.56 |
| 11/03/17 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 1,056.70 |
| 11/24/17 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 398,950.97 |
| 12/11/17 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 1,056.70 |
| 12/20/17 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 398,950.97 |
| 12/20/17 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 398,950.97 |
| 01/08/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 1,056.70 |
| 01/24/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 15,838.98 |
| 01/30/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 28,954.69 |
| 02/02/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 440,663.41 |
| 02/13/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 2,688.99 |
| 02/15/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 393,448.22 |
| 02/27/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 952.06 |
| 03/23/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 11,193.37 |
| 03/26/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 398.56 |
| 04/09/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 4,370.60 |
| 04/23/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 12,349.47 |
| 05/01/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 3,393.45 |
| 05/11/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 9,890.27 |
| 05/17/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 952.06 |
| 05/22/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 393,448.22 |
| 05/22/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 346,234.62 |
| 06/04/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 393,448.22 |
| 06/19/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 14,348.97 |
| 07/03/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 952.06 |
| 07/24/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 6,571.74 |
| 08/10/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 1,375.69 |
| 08/17/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 786,896.44 |
| 08/17/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 8,923.90 |
| 08/28/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 3,788.60 |

| Clear Date | Transferor | Transferee | Cash Disbursements |
|---|---|---|---|
| 09/18/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 952.06 |
| 09/25/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 2,496.37 |
| 10/16/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 4,478.85 |
| 11/08/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 1,180,344.66 |
| 11/09/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 1,411.14 |
| 11/27/18 | DC Solar Distribution, Inc. | Ahern Rentals Inc. | 6,344.32 |
| **Total - DC Solar Distribution, Inc.** | | | **14,549,208.09** |
| | | | |
| 02/06/15 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 366,850.00 |
| 02/17/15 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 726.37 |
| 02/27/15 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 399.37 |
| 03/09/15 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 2,745.74 |
| 03/23/15 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 399.37 |
| 03/31/15 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 41,991.93 |
| 04/10/15 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 17,500.00 |
| 04/27/15 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 4,286.63 |
| 05/05/15 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 7,156.81 |
| 05/22/15 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 3,239.78 |
| 07/15/15 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 512.88 |
| 07/15/15 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 244.52 |
| 07/20/15 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 733,700.00 |
| 07/29/15 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 366,850.00 |
| 08/31/15 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 366,850.00 |
| 10/06/15 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 733,700.00 |
| 01/19/16 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 2,022.26 |
| 01/25/16 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 24,331.16 |
| 02/16/16 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 560.50 |
| 09/29/16 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 32.64 |
| 11/21/16 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 2,246.67 |
| 11/29/16 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 1,108.14 |
| 12/09/16 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 1,347.40 |
| 03/10/17 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 749.15 |
| 03/20/17 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 659.01 |
| 04/07/17 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 75.00 |
| 04/24/17 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 680.97 |
| 05/16/17 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 140.60 |
| 06/13/17 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 469.23 |
| 06/30/17 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 1,032.29 |
| 10/13/17 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 3,423.17 |
| 10/20/17 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 26.98 |
| 12/11/17 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 1,735.53 |
| 01/25/18 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 1,643.52 |
| 01/30/18 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 1,175.39 |
| 02/27/18 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 326.58 |

| Clear Date | Transferor | Transferee | Cash Disbursements |
|---|---|---|---|
| 03/05/18 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 149.96 |
| 03/19/18 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 112.08 |
| 03/23/18 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 1,194.82 |
| 04/23/18 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 1,904.75 |
| 05/17/18 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 6,959.48 |
| 05/29/18 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 1,254.77 |
| 06/19/18 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 860.68 |
| 07/03/18 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 4,243.73 |
| 07/24/18 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 860.68 |
| 08/20/18 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 5,263.30 |
| 08/28/18 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 1,345.63 |
| 09/18/18 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 2,118.18 |
| 09/25/18 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 860.68 |
| 10/16/18 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 3,359.54 |
| 11/05/18 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 190.00 |
| 11/09/18 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 860.68 |
| 11/29/18 | DC Solar Solutions, Inc. | Ahern Rentals Inc. | 860.68 |
| **Total - DC Solar Solutions, Inc.** | | | **2,723,339.23** |
| **Total Cash Disbursements** | | | **$ 17,272,547.32** |

| Clear Date | Transferor | Transferee | Cash Disbursements |
|---|---|---|---|
| 01/19/16 | DC Solar Solutions, Inc. | Xtreme Manufacturing LLC | $ 1,000,000.00 |
| 06/07/16 | DC Solar Solutions, Inc. | Xtreme Manufacturing LLC | 644,000.00 |
| 08/01/16 | DC Solar Solutions, Inc. | Xtreme Manufacturing LLC | 2,299,506.24 |
| 09/30/16 | DC Solar Solutions, Inc. | Xtreme Manufacturing LLC | 650,000.00 |
| 12/09/16 | DC Solar Solutions, Inc. | Xtreme Manufacturing LLC | 1,202.30 |
| 05/18/17 | DC Solar Solutions, Inc. | Xtreme Manufacturing LLC | 361,970.00 |
| 05/18/17 | DC Solar Solutions, Inc. | Xtreme Manufacturing LLC | 247,520.00 |
| 06/30/17 | DC Solar Solutions, Inc. | Xtreme Manufacturing LLC | 1,228,560.00 |
| 09/05/17 | DC Solar Solutions, Inc. | Xtreme Manufacturing LLC | 1,063,852.50 |
| 11/09/17 | DC Solar Solutions, Inc. | Xtreme Manufacturing LLC | 726,862.50 |
| 11/20/17 | DC Solar Solutions, Inc. | Xtreme Manufacturing LLC | 562,230.00 |
| 01/31/18 | DC Solar Solutions, Inc. | Xtreme Manufacturing LLC | 713,337.50 |
| 03/28/18 | DC Solar Solutions, Inc. | Xtreme Manufacturing LLC | 998,887.50 |
| 05/30/18 | DC Solar Solutions, Inc. | Xtreme Manufacturing LLC | 995,995.00 |
| 07/03/18 | DC Solar Solutions, Inc. | Xtreme Manufacturing LLC | 1,110,675.00 |
| 09/06/18 | DC Solar Solutions, Inc. | Xtreme Manufacturing LLC | 935,248.00 |
| 09/06/18 | DC Solar Solutions, Inc. | Xtreme Manufacturing LLC | 847,059.50 |
| 10/11/18 | DC Solar Solutions, Inc. | Xtreme Manufacturing LLC | 610,470.00 |
| 11/21/18 | DC Solar Solutions, Inc. | Xtreme Manufacturing LLC | 828,894.00 |
| **Total Cash Disbursements** | | | **$ 15,826,270.04** |

**EXHIBIT 2** Page 1 of 1